STATE OF MINNESOTA

IN SUPREME COURT

A22-0183

Court of Appeals                                                          Thissen, J.
Dissenting, Chutich, J.
Took no part, Procaccini, J.

In the Matter of the Surveillance and
Integrity Review (SIRS) Appeals by Trinity
Home Health Care Services and Etyane Ayana.

Filed: October 11, 2023
Office of Appellate Courts

_____

Matthew J. Schaap, Cassandra C. Wolfgram, Dougherty, Molenda, Solfest, Hills & Bauer
P.A., Apple Valley, Minnesota, for appellants.

Keith Ellison, Attorney General, Leonard J. Schweich, Assistant Attorney General, Saint
Paul, Minnesota, for respondent.

Keith Ellison, Attorney General, Rachel Bell-Munger, Assistant Attorney General, Saint
Paul, Minnesota, for amici curiae Commissioners of the Minnesota Departments of Health,
Labor and Industry, and Veterans Affairs.

Brianna Boone, Russell Squire, Southern Minnesota Regional Legal Services, Saint Paul,
Minnesota, for amicus curiae Southern Minnesota Regional Legal Services.

_____

S Y L L A B U S

The Department of Human Services does not have the authority to remand a case to an administrative law judge under Minn. Stat. § 14.62 (2022), or under any other source of implied authority, after the administrative law judge issues a final recommendation.

Reversed.

O P I N I O N

THISSEN, Justice.

The question in this case is whether the Department of Human Services (DHS) appropriately remanded a case to an administrative law judge (ALJ) under the Minnesota Administrative Procedure Act, Minn. Stat. § 14.62 (2022). We conclude that DHS did not have the authority to remand the case to the ALJ. Accordingly, the ALJ's September 21, 2019, Findings of Fact, Conclusions of Law, and Recommendation—the ALJ's first report—is the binding decision in this matter. Based on this resolution of the case, we do not reach the questions of whether the DHS Commissioner's final order issued after the remand to the ALJ was arbitrary and capricious or whether the final order was supported by substantial evidence.

**FACTS**

Appellant Etyane Ayana is the sole owner of appellant Trinity Home Health Care Services (collectively, "Trinity"). Trinity provides nursing services, personal care assistant (PCA) services, and homemaking services. It receives reimbursement from respondent DHS for services that it provides to Medicaid-eligible persons with disabilities. Minnesota's Medicaid program is known as Medical Assistance. As part of its oversight

2

of the program, DHS has a Surveillance and Integrity Review Section (SIRS), which conducts audits and investigations into suspected noncompliance with program requirements.

Medicaid is a joint federal-state program. Federal law requires DHS to make sure that providers comply with federal program requirements as a condition of receiving federal funding. 42 U.S.C. § 1396c. SIRS's responsibility includes "identifying and investigating fraud, theft, abuse, or error by vendors or recipients of health services." Minn. R. 9505.2160 (2021). DHS can impose sanctions and fines—including termination from the program—on Medical Assistance vendors who (among other things) commit "fraud, theft, or abuse." Minn. Stat. § 256B.064, subds. 1a and 1b (2022). DHS can also "obtain monetary recovery from a vendor who has been improperly paid either as a result of conduct [including fraud, theft, or abuse] or as a result of a vendor or department error, regardless of whether the error was intentional." Minn. Stat. § 256B.064, subd. 1c (2022).

This saga began nearly 8 years ago. SIRS's first investigation of Trinity and Ayana began in 2015 following complaints about Trinity's services. As part of that investigation, SIRS investigators conducted an onsite review of Trinity in March 2016.[1] The investigator reviewed and scanned some Trinity records from the period between January 1, 2015, to

---

[1]    Under Minnesota Rule 9505.2185, subpart 2 (2021), a vendor "shall grant the department access during the department's normal business hours to examine health service and financial records related to a health service billed to a program." SIRS also has the authority to "investigate vendors . . . to monitor compliance with program requirements for the purposes of identifying fraud, theft, abuse, or error in the administration of the programs," Minn. R. 9505.2200, subp. 1 (2021), and this "authority to investigate extends to the examination of any person, document, or thing which is likely to lead to information relevant to the expenditure of funds," *id.*, subp. 3 (2021).

March 8, 2016. The investigator compared the documentation to billed claims and determined that Trinity had been overpaid $640,641.12 for nursing services, $277,187.30 for PCA services, and $2,599 for homemaking services.[2] The investigator did not contact Trinity regarding any problems that she found. In May 2016, DHS referred the matter to

---

[2]      Specifically, SIRS concluded that the overpayment included:

- $640,641.12 for nursing services. The investigator based her calculation on evidence of missing or insufficient documentation; Licensed Practicing Nurses (LPNs) billed as Registered Nurses (RNs); overlapping shifts; and a failure to document time. The investigator used the following standards in calculating this overpayment: (1) a timesheet was not enough documentation to show that services were provided to a patient; and (2) an overpayment amount was calculated for the entire period of claimed time if there were no progress notes for the claim billed.

- $277,187.30 for PCA services. State law requires that PCA agencies maintain certain documentation including "time sheets for each personal care assistant" and a personal care plan for each recipient of care, which must be updated annually. Minn. Stat. § 256B.0659, subds. 7, 28(a)(4) (2022). The statute requires that care plans include "start and end date[s] of the care plan" and a plan for how the recipient will use PCA services over the course of the year. *Id.*, subd. 7. The statute sets forth several requirements for the information that must be in the time sheet. Minn. Stat. § 256B.0659, subd. 12(c) (2022). The investigator found the following errors in Trinity's records: no time documented on a timesheet; missing timesheets; missing other required components on the timesheet (signatures, provider number, activities completed, fraud statement); submission of time by PCAs who failed a background study; timesheets that had conflicting information for the service dates, service recipient, and PCA; photocopied timesheets; and claims for services on dates when recipient was receiving inpatient care.

- $2,599 for homemaking services. The investigator found that timesheets for the billed services were missing altogether or were missing information about the time of service and other required components on the timesheets (such as signatures). The investigator also found examples in which Trinity billed for overlapping time when the same individual provided PCA services and homemaking services for the same recipient.

4

Minnesota's Medicaid Fraud Control Unit. By January 2017, the case was closed without action.

Almost a year and a half later, on May 2, 2018, SIRS pursued further investigation. In July 2018, a new SIRS lead investigator conducted a second onsite review of Trinity for service dates of March 1, 2017, to December 31, 2017. Following review of the records, the SIRS investigator determined that, for the time period, Trinity had been overpaid $52,660.10 for nursing services, $287,006.93 for PCA services, and $696.49 for homemaker services. The reasons for SIRS finding an overpayment were similar to the 2016 investigation. DHS concluded that termination was the appropriate sanction and that an immediate payment withhold was in order.

In February 2019, DHS sent Trinity and Ayana notices of termination from the program, as well as notices demanding return of overpayments and payment-withholding. Trinity and Ayana appealed.

The lead investigator changed again in April 2019. At that time, the investigator reviewed SIRS's overpayment spreadsheets. Based on her review of the documents for Trinity's nursing services, the investigator determined that the total overpayment for nursing (from the 2016 and 2018 investigations) was higher than the first investigator believed—$681,810.84—and calculated that the total overpayment for PCA services (from the 2016 and 2018 investigations) was $614,982.05. DHS sent amended notices to Trinity and Ayana.

The dispute between DHS, Trinity, and Ayana was submitted for a contested case hearing under Minnesota Statutes chapter 14 (2022). DHS and Trinity participated in a

5

3-day evidentiary hearing before the administrative law judge. The ALJ admitted into evidence the three amended notices and the associated spreadsheets. The spreadsheets included columns for the name of the service recipient, the date of service, the units (time) allowed, the units and money paid for the service, the amount of money that DHS determined was overpaid, and the reason that DHS believed there was an overpayment. The ALJ also admitted into evidence three additional exhibits—voluminous images of the documents that the investigators scanned during the 2016 and 2018 onsite reviews. The spreadsheets did not identify which documents were connected with each specific entry on the spreadsheets.

On September 21, 2019, the ALJ issued his report ("First Report"), concluding that DHS did not meet its burden to establish, by a preponderance of the evidence, that Trinity committed abuse in obtaining funds from Medical Assistance for homemaking, nursing, and PCA services provided to clients. *See* Minn. R. 1400.7300, subp. 5 (2021). The ALJ found that all three DHS investigators testified credibly. The ALJ further found that Ayana's credibility was suspect and thus did not give Ayana's testimony much weight unless supported by corroborating evidence. The ALJ stated that if DHS had proven what it alleged in the homemaking, nursing, and PCA notices, then Trinity's behavior would constitute abuse. But the ALJ concluded that because DHS only summarized its spreadsheets and did not identify the "real evidence" upon which the spreadsheets were based, he would not give the spreadsheets weight, so DHS failed to meet its burden of

6

proof.[3] Notably, the ALJ stated that "the real evidence is not specifically cited in the spreadsheets, reports, or even in [DHS's] summation of its case." Moreover, DHS did not present any witness who could point the ALJ to the documentation.

The ALJ found that DHS met its burden to show abuse occurred based on Trinity's failure to provide all records at the time of the two site visits. But the ALJ also concluded that overpayments were not "the result of" this abuse, so continuing to withhold payments was inappropriate. And the ALJ found that terminating Trinity's participation in the Minnesota Health Care Programs was an inappropriate sanction for failure to provide records at the time of the site visits.

---

[3] The ALJ provided several examples to show why he found the spreadsheets unreliable. For example, the ALJ explained that Trinity billed 2 hours of homemaker services on June 3, 2015. DHS's spreadsheet states that Trinity billed 3 hours. The ALJ explained that "there is no real evidence supporting what Trinity claimed for reimbursement. . . . In other words, there is no proof that Trinity claimed an hour more than it was owed for homemaker services on June 3, 2015, for the recipient."

The ALJ explained that to recover for an overpayment, DHS must show that the abuse resulted in an improper payment. Minn. Stat. § 256B.064, subd. 1c(a). The ALJ found that DHS had only shown that the requested records were not timely provided at site visits under Minn. R. 9505.2185 (2021). The ALJ determined, however, that this fact did not prove that DHS made improper payments.

DHS timely filed its exceptions and Trinity and Ayana timely submitted a response to DHS's exceptions.[4]   Ultimately, the record in the ALJ proceeding closed on November 2, 2020.  *See* Minn. Stat. § 14.61, subd. 2.[5]

In this case, the ALJ's report is a recommendation to the Commissioner of DHS; the Commissioner has the final decision-making authority.  *See* Minn. Stat. § 14.62, subd 2a.  Minnesota Statutes section 14.62, subdivision 1, of the Minnesota Administrative Procedure Act, sets forth the steps the Commissioner must take following the issuance of the ALJ's report and recommendation:

> Every decision and order rendered by an agency in a contested case shall be in writing, shall be based on the record and shall include the agency's findings of fact and conclusions on all material issues.  A decision or order that rejects or modifies a finding of fact, conclusion, or recommendation contained in the report of the administrative law judge . . . must include the reasons for each rejection or modification.

Minn. Stat. § 14.62, subd. 1.  Further, under Minn. Stat. § 14.62, the Commissioner has 90 days from the date the ALJ proceeding closed to issue a final order or the ALJ's report

---

[4]     Under section 14.61, subdivision 1, of the Minnesota Administrative Procedure Act, the agency decision-maker cannot make the final decision "until the report of the administrative law judge . . . has been made available to parties to the proceeding for at least ten days and an opportunity has been afforded to each party adversely affected to file exceptions and present argument to a majority of the officials who are to render the decision."  Minn. Stat. § 14.61, subd. 1.  Here, DHS submitted its exceptions, arguing that the record, the evidence, and the testimony at the administrative hearing showed that it is entitled to monetary recovery.  Trinity submitted a response to the exceptions and contended that the ALJ's First Report was correct.

[5]     Minnesota Statutes section 14.61, subdivision 2, states that when the agency makes the final decision (like here), "the contested case record must close upon the filing of any exceptions to the report and presentation of argument under subdivision 1 or upon expiration of the deadline for doing so."  Minn. Stat. § 14.61, subd. 2.

and recommendation constitutes the final decision in the case. Minn. Stat. § 14.62, subd. 2a ("Unless otherwise provided by law, the report or order of the administrative law judge constitutes the final decision in the case unless the agency modifies or rejects it under subdivision 1 within *90 days* after the record of the proceeding closes under section 14.61." (emphasis added)).

The 90-day period for the Commissioner to make her decision ended on February 1, 2021. Just before the Commissioner's final order was due, the Commissioner filed with the Chief ALJ a motion for extension of the deadline to issue the agency's decision. *See* Minn. Stat. § 14.62, subd. 2a (authorizing an extension upon a showing of good cause). The Chief ALJ granted DHS a 30-day extension on January 28, 2021, with a new deadline of March 3, 2021.

On the March 3, 2021, deadline to issue the final order, the Commissioner issued an order remanding the case to the ALJ for further proceedings. The Commissioner's primary concern was that the ALJ did not give proper weight to the spreadsheets (based on the Commissioner's interpretation of Minnesota Rule of Evidence 1006) and the evidence of abuse reflected therein. In particular, the Commissioner contended that the ALJ failed to apply or improperly applied Minnesota Rule of Evidence 1006 (voluminous evidence).[6]

---

[6]     Minnesota Rule of Evidence 1006 states:

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court.

The Commissioner also submitted updated spreadsheets that provided more information on which underlying documents supported each entry on the spreadsheets.

At the end of August 2021, the ALJ issued a second Findings of Fact, Conclusions of Law, and Recommendation ("Second Report"). In the Second Report, the ALJ concluded that the Commissioner had implied authority to remand the case to the ALJ and that the remand was a rejection of the First Report. But the ALJ also renewed (with one exception) his recommendation that DHS had not carried its burden of proof in showing abuse sufficient to justify monetary recovery or the termination sanction. Again, the ALJ explained that DHS did not meet its burden in verifying the spreadsheets and he would therefore not rely on them.

The Commissioner issued a timely final order on January 10, 2022.[7] She accepted the information set forth in the spreadsheets as accurate and sufficient to support DHS's claim of abuse. Accordingly, she modified the ALJ's report and concluded that Trinity had engaged in the abuse outlined in DHS's notices and spreadsheets. The Commissioner ordered repayment of $681,810.84 for nursing services, $614,982.05 for PCA services, and $696.49 for homemaker services and terminated Trinity and Ayana.

Trinity and Ayana appealed the Commissioner's final order to the court of appeals, which affirmed. *In re SIRS Appeals by Trinity Home Health Care Servs. & Etyane Ayana*, No. A22-0183, 2022 WL 6272045 (Minn. App. Oct. 10, 2022). We granted review on two

---

[7] The contested case record for the Second Report closed on October 12, 2021, at which point the 90-day deadline under section 14.62 started. The 90-day period expired on January 10, 2022.

questions: (1) Did the Commissioner have power to remand the case to the ALJ after the ALJ's First Report? and (2) Was the Commissioner's final order supported by substantial evidence or was it arbitrary and capricious?[8]

**ANALYSIS**

This case requires us to answer the following question: Did the Legislature in the Minnesota Administrative Procedure Act (the Act) grant the Commissioner power to remand the case to an ALJ after the ALJ has issued a report with recommendation to the agency? We conclude that the Commissioner does not have the power to remand a case to the ALJ in such circumstances. Therefore, the First Report of the ALJ is the final decision in the case.

A.

"Whether an administrative agency has acted within its statutory authority is a question of law that we review de novo." *In re Hubbard*, 778 N.W.2d 313, 318 (Minn. 2010). To determine whether the Commissioner acted within her statutory authority in remanding the case to the ALJ, we must interpret the Minnesota Administrative Procedure Act. We review questions of statutory interpretation de novo. *Matter of Midway Pro Bowl Relocation Benefits Claims*, 937 N.W.2d 423, 425 (Minn. 2020). The first question we must answer is whether the Act plainly tells us that the Commissioner has—or does not have—the power to remand a case to the ALJ after the ALJ has issued a report

---

[8]    Based on our disposition of the case, we need not reach the question of whether the Commissioner's final order was arbitrary and capricious or supported by substantial evidence.

with recommendation. *State v. Fugalli*, 967 N.W.2d 74, 77 (Minn. 2021) (stating that "[t]he first step in statutory interpretation" is to determine whether there is only one reasonable way to read the text—in which case that reading controls—or more than one).

We start with section 14.62, subdivision 2a, which provides:

> Unless otherwise provided by law, the report or order of the administrative law judge *constitutes the final decision* in the *case unless the agency modifies or rejects it* under subdivision 1 within 90 days after the record of the proceeding closes under section 14.61. When the agency fails to act within 90 days on a licensing case, the agency must return the record of the proceeding to the administrative law judge for consideration of disciplinary action. . . . Upon a showing of good cause by a party or the agency, the chief administrative law judge may order a reasonable extension of either of the two 90-day deadlines specified in this subdivision.

(Emphasis added.) Section 14.62, subdivision 2a, is a limitations provision: it sets a 90-day deadline for the Commissioner to make a final decision after the ALJ issues a report with recommendation and the record before the ALJ has closed. *See* Minn. Stat. §§ 14.50 (stating that it is the "duty of the [administrative law] judge to make a report on each proposed agency action . . . stating findings of fact and conclusions and recommendations"); 14.61, subd. 1 (prohibiting the agency from issuing a final decision when a contested case proceeding is required until the parties adversely affected have been afforded an opportunity to file exceptions); 14.61, subd. 2 (explaining "[c]losure of record" before the ALJ).

One reasonable reading of section 14.62, subdivision 2a—the one urged by Trinity—is that the Commissioner's authority after receiving an ALJ's report with recommendation is limited to three options. First, she may accept the ALJ's report with recommendation as the Commissioner's decision. Second, she may modify the ALJ's

12

report with recommendation and provide reasons for her modifications. Third, she may reject the ALJ's report with recommendation and provide reasons for her rejection. The statutory text does not give the Commissioner authority to pursue a fourth option—to remand the case to the ALJ. We cannot add the word "remand" to the statute. *See Reider v. Anoka-Hennepin Sch. Dist. No. 11*, 728 N.W.2d 246, 250 (Minn. 2007) ("[W]e cannot add terms that the legislature has omitted.").

DHS does not contest that the Commissioner's authority after receiving an ALJ's report with recommendation is limited to one of three options. Rather, it argues that a remand is not an unmentioned fourth option but rather a species of the third option—rejection. Because chapter 14 does not define "rejects," DHS turns to dictionary definitions to make its case. It observes that commonly used dictionaries define "reject" as "[t]o refuse to accept, submit to, believe, or make use of; [t]o refuse to consider or grant; deny." *E.g.*, *The American Heritage College Dictionary* 1151 (3d ed. 2000). And that, DHS asserts, is precisely what the Commissioner did when she refused to consider the ALJ's findings and recommendation and instead remanded the case to the ALJ to reconsider its decision.

Of course, we may look to dictionaries to assist in understanding the meaning of a statute. *State v. Thonesavanh*, 904 N.W.2d 432, 436 (Minn. 2017). But "the dictionary is not foolproof or failsafe" and "[i]t is not unusual to set aside dictionary definitions when context makes clear that dictionary definitions may not fit." *State v. Scovel*, 916 N.W.2d 550, 555 (Minn. 2018); *see Chiodo v. Bd. of Ed. of Special Sch. Dist. No. 1*, 215 N.W.2d 806, 808 (Minn. 1974) (rejecting the dictionary definition of "instruction" when

13

interpreting Minn. Stat. § 125.17, subd. 1(a), because "words of a statute are to be viewed in their setting, not isolated from their context"); *City of Brainerd v. Brainerd Invs. P'ship*, 827 N.W.2d 752, 760 (Minn. 2013) (Anderson, J., dissenting) ("[W]e must not look simply at a dictionary definition. . . . Instead, we *must* assess whether applying the dictionary definition makes sense in context.").

We are not convinced by DHS's argument. First, the definition DHS points to is broad and multifaceted. Not all the meanings included in the dictionary definition support DHS's position. For instance, to remand (which means to "send back," *Remand*, *Black's Law Dictionary* (11th ed. 2019)) is not a *denial* of the ALJ's order, but instead a request for reconsideration.[9] In such circumstances, the dictionary definitions, standing alone, are less helpful in establishing ordinary meaning.

More fundamentally, the options available to the Commissioner—accept the ALJ's report with recommendation, modify the report, or reject the report—must be considered against the contextual backdrop in which the statute authorizes the Commissioner to exercise those options. Section 14.62, subdivision 2a, places a time limitation—90 days after the record closes in the contested case before the ALJ—for the issuance of a final decision by the agency. Accordingly, a decision by the Commissioner that accepts, modifies, or rejects an ALJ's report with recommendation is one that results in a final

---

[9]     It does not automatically follow that, as the dissent argues, sending a case back to the ALJ means that the Commissioner rejected all the ALJ's recommendations.

14

decision.[10] This conclusion is reinforced by the third sentence of section 14.62, subdivision 2a, which provides that "[i]n all contested cases where the report or order of the administrative law judge constitutes the final decision in the case, the administrative law judge shall issue findings of fact, conclusions, and an order within 90 days after the hearing record closes under section 14.61." Minn. Stat. § 14.62, subd. 2a.[11] The Legislature's meaning in section 14.62 is clear: whether the agency accepts the ALJ's findings, conclusions and/or recommendations, or modifies or rejects the ALJ's findings, conclusions and/or recommendations, a final decision in a contested case hearing must be

---

[10] It is also important to keep in mind that, unless the agency otherwise agrees, the agency—and not the ALJ—has the final word on the disposition of a case. The agency does not have to accept any of the ALJ's findings, conclusions, or recommendations as long as the agency sets forth reasonable justifications for its decision. Minn. Stat. § 14.62, subd. 1; *see In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn. 2001) ("When reviewing agency decisions we 'adhere to the fundamental concept that decisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience.' " (quoting *Rsrv. Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn. 1977))). This case is a good example. After the ALJ issued his Second Report, the Commissioner issued a final decision modifying several of the ALJ's findings of fact and conclusions and wholly rejecting the ALJ's dispositional recommendations—and it did so for the same reasons that it ordered the remand in the first place. The Commissioner had authority to issue the same decision after the First Report. The only differences are that on remand, the agency polished up its initial spreadsheets by adding a column that connected the spreadsheet entries to documents in the record, *see* Minn. Stat. § 14.60, subd. 2 (stating that "[n]o factual information or evidence shall be considered in the determination of the case unless it is part of the record"), and Trinity had to wait months more while the investigation hung over its head and had payments withheld. Notably, the Commissioner at the same time suggests that the amended spreadsheet does not constitute new evidence in the record.

[11] Under Minn. Stat. § 14.57(a), "[u]pon initiation of a contested case proceeding, an agency may, by order, provide that the report or order of the administrative law judge constitutes the final decision in the case."

15

issued by the agency within 90 days of the closure of the contested case proceedings before the ALJ.[12]  The broad interpretation of "rejects" offered by DHS, which allows it to send the case back to the ALJ indefinitely, does not result in a final decision in the matter.  *See* Minn. Stat. § 14.62, subd. 1 (stating that an agency can only modify or reject in the context of a "decision and order . . . [which] shall include the agency's findings of fact and conclusions on *all material issues*" (emphasis added)).  The argument that the meaning of the word "rejects" in section 14.62, subdivision 2a, includes the power to indefinitely remand is not reasonable.[13]

---

[12]    As shown in this case, the 90-day limitation on the issuance of a final decision may be extended by the chief administrative law judge for good cause.  Minn. Stat. § 14.62, subd. 2a.

[13]    As the dissent, DHS, and some of the amici suggest, there may be good policy reasons to allow a remand in contested case proceedings.  For instance, it may be that there are some kinds of remand that would be appropriate based on the ALJ's role as a factfinder.  As amicus Southern Minnesota Regional Legal Services asserts, a remand from the Commissioner to the ALJ could allow the record to reopen to allow parties to bring in new facts or new information that emerged after the record closes.  *Cf.* Minn. Stat. § 14.67 (allowing the court of appeals to order the agency to take additional material evidence where there are "good reasons for failure to present it in the proceeding before the agency").  A remand may also allow the record to reopen if there has been a mistake of law.  In that case, the facts would need to be reviewed because the ALJ and parties applied, for example, the wrong statute, or a new case was issued following the ALJ report that interpreted the law differently.  In contrast, a remand (like the one here) where DHS does not provide new evidence or new law, but instead contends that the ALJ wrongly interpreted the evidence, may not align as well with the ALJ's role as a fact-finder within contested case proceedings.  We cannot justify the dissent's argument that a remand may be allowed in *some* circumstances.  The dissent offers no explanation, *based on the statutory language*, of why one type of remand is a rejection and another type is not.  In short, the policy arguments for allowing remand are nuanced.  Sorting out those policy arguments, especially where the Legislature has not statutorily provided for any remand authority, is better left to the Legislature, which has the power to amend the statute if it chooses to do so.

16

We therefore conclude that section 14.62, subdivision 2a, provides the agency with three options after receiving the ALJ's report with recommendation: to accept the ALJ's report as the agency's final decision; to "modif[y]" the ALJ's report; or to "reject" the ALJ's report. A remand is not a rejection. The option to remand is not permitted.

B.

DHS also argues that even if Minnesota Statutes section 14.62, subdivision 2a, does not authorize the Commissioner to remand a closed contested case proceeding to the ALJ, she nonetheless may do so. DHS makes two arguments. First, DHS contends that the Commissioner has authority to remand a case because of the agency's general authority to administer and supervise Medicaid. Second, DHS argues that the Commissioner has implied authority to remand a case to the ALJ under our case law.

1.

We do not agree that the Commissioner's broad power to administer and supervise all forms of public assistance provided for under state law and, specifically, to prevent waste and protect taxpayer funds under Minnesota Statutes section 245.03, subd. 2(1) (2022), includes the specific power to remand a closed contested case proceeding to the ALJ to reconsider the ALJ's report with recommendation. This case is about the procedures for contested cases set forth in the Act. Those procedures are not specific to DHS. Rather, the Act and its implementation are under the purview of the Office of Administrative Procedure. Minn. Stat. § 14.51 (empowering the chief administrative law judge to adopt rules to govern the procedural conduct of contested case hearings). DHS's assertion of broad authority to do whatever the agency deems necessary to administer and

17

supervise public assistance programs—even to override the limitations placed on agency decision-making in the Act—proves too much. As one relevant example, taken to its logical end point, DHS's argument would allow it to ignore the contested case process entirely. The rule that DHS urges us to accept would essentially create a special DHS procedural rule for contested cases. We see no basis in the statute to support that result. *See Shefa v. Ellison*, 968 N.W.2d 818, 835 (Minn. 2022) (stating that a more specific grant of power prevails over a general grant of power).

2.

We also disagree with the claim by DHS that the Commissioner has implied authority under our case law to remand a case to the ALJ. We start by observing that "[a]n agency's authority may be stated either expressly in statute or implied from the express powers given to the [agency] by the Legislature." *Matter of Otter Tail Power Co.*, 942 N.W.2d 175, 179 (Minn. 2020). " '[A]ny enlargement of express powers by implication must be fairly drawn and fairly evident from the agency objectives and powers expressly given by the legislature.' " *Id.* (quoting *Minnegasco v. Minn. Pub. Utils. Comm'n*, 549 N.W.2d 904, 907 (Minn. 1996)). The Act, and in particular, section 14.62, limits the scope of what a state agency like DHS may do once an ALJ issues a report with recommendation and the contested case proceeding before the ALJ is closed. The power to remand a contested case to an ALJ may not be fairly implied from the powers granted by statute; indeed, that power is expressly limited by statute.

DHS cites to two of our prior decisions and one court of appeals decision to support its claim of implied authority: *Anchor Casualty Co. v. Bongards Co-Operative Creamery*

18

*Ass'n*, 91 N.W.2d 122, 126 (Minn. 1958), *State ex rel. Turnbladh v. District Court*, 107 N.W.2d 307, 312–13 (Minn. 1960), and *Pfalzgraff v. Commissioner of Economic Security*, 350 N.W.2d 458, 460 (Minn. App. 1984). We disagree that the cases demonstrate DHS has implied authority to remand a contested case report with recommendation to the ALJ that issued it with instructions to reconsider the decision.

First, the Legislature did not enact section 14.62, subdivision 2a—the provision at issue—until 2002. Each of the opinions upon which DHS relies were issued before 2002.

The Legislature enacted the first iteration of the Minnesota Administrative Procedure Act in 1957 and did not set a timeline for agency actions in contested cases. Act of Apr. 27, 1957, ch. 806, §§ 1–14, 1957 Minn. Laws 1100, 1100–05. In 1980, the Legislature enacted predecessor language to the current section 14.62, subdivision 2a. Act of Apr. 24, 1980, ch. 615, § 18, 1980 Minn. Laws 1542, 1551. The language provided:

> Unless otherwise provided by law, if an agency fails to render a decision and order in a contested case within 90 days after the submission of the final hearing examiner report and subsequent exceptions and arguments under section 14.61 if any, any party may petition the district court for an order requiring the agency to render a decision and order on the contested case within such time as the court determines to be appropriate. The order shall be issued unless the agency shows that further delay is reasonable.

Minn. Stat. § 14.62, subd. 2 (1982).[14] Again, this statute did not mandate a deadline for agency action.

---

[14] In 1983, the Legislature changed section 14.62, subdivision 2, to require the party to petition the court of appeals (not the district court) "for an order requiring the agency to render a decision and order on the contested case within such time as the court determines to be appropriate." Act of June 1, 1983, ch. 247, § 8, 1983 Minn. Laws 852, 856.

In 2002, the Legislature amended section 14.62, subdivision 1, to add the current language which includes the requirement that any "decision or order that rejects or modifies a finding of fact, conclusion, or recommendation" of the ALJ must "include the reasons for each rejection or modification." Act of Mar. 21, 2002, ch. 251, § 4, 2002 Minn. Laws 234, 235. At the same time, the Legislature repealed section 14.62, subdivision 2, and adopted subdivision 2a, which stated that the ALJ's report would be final unless the agency "modifies or rejects it" within 90 days. *Id.*, ch. 251, §§ 5, 7, Minn. Laws at 235. In other words, it was not until 2002 that the Legislature constrained agency authority in contested case hearings with a specific 90-day deadline for the agency to issue a final decision and the provision that the ALJ's report with recommendation was the final agency decision if the agency did not otherwise act to modify or reject the ALJ's findings of fact, conclusions and/or recommendations before the deadline. Of course, our decisions and the decision of the court of appeals cited by DHS, all issued before 2002, could not have accounted for the 2002 limitations placed on agency authority in contested case hearings.

The cases are also procedurally and otherwise distinguishable. In *Anchor Casualty*, we interpreted a provision of the Wholesale Produce Dealers Act. 91 N.W.2d at 125–26. Under the law, all wholesale produce dealers had to obtain a surety bond. *Id.* at 123. The specific provision at issue, Minn. Stat. § 27.06 (1953), required that the Commissioner of Agriculture determine that a claim by a person seeking to recover under the bond fell within the scope of the surety's undertaking before the aggrieved person could sue to recover in district court. *Anchor Casualty*, 91 N.W.2d at 125. Section 27.06 established the procedures under which the Commissioner of Agriculture considered and made such a

determination.[15] *Anchor Casualty*, 91 N.W.2d at 124–26. The case unsurprisingly did not address the Minnesota Administrative Procedure Act, the first rudimentary version of which the Legislature enacted in 1957—a year after the agency decision at issue in *Anchor Casualty*. *See id.* at 124.

The legal question we addressed in *Anchor Casualty* was whether an agency commissioner had the power under section 27.06 to set aside his initial order and reopen the proceedings for the purpose of reconsidering his decision and taking additional evidence when the decision to set aside the initial order occurred before the rights of the parties to the proceedings had been prejudiced. *Anchor Casualty*, 91 N.W.2d at 124. We expressly observed that section 27.06 did "not specifically grant to the commissioner the power to open and rehear matters, [but] neither [did] it deny that power to him." *Anchor Casualty*, 91 N.W.2d at 125. Under those circumstances, we held that because no party was prejudiced by the decision to reopen the case, the commissioner had the authority to

---

[15] The statute provided in relevant part:

27.06 COMPLAINTS FILED WITH COMMISSIONER. Any person claiming himself to be damaged by any breach of the conditions of a bond given by a licensee, as herein provided, may enter complaint thereof to the commissioner, which complaint shall be a written statement of the facts constituting the complaint. Upon filing the complaint in the manner herein provided, the commissioner shall investigate the charges made and, at his discretion, order a hearing before him, giving the party complained of notice of the filing of the complaint and the time and place of the hearing. At the conclusion of the hearing the commissioner shall report his findings and render his conclusions, upon the matter complained of, to the complainant and the respondent in each case, who shall have 15 days following in which to make effective and satisfy the commissioner's conclusions.

21

set aside the initial order and reopen the proceeding under section 27.06. *Anchor Casualty*,

91 N.W.2d at 126. We quoted approvingly a decision of the Supreme Court of New Jersey:

> *Barring statutory regulation*, the power [to reopen a decision] may be invoked by administrative agencies to serve the ends of essential justice and the policy of the law. But there must be reasonable diligence. The denial to such tribunals of the authority to correct error and injustice and to revise its judgments for good and sufficient cause would run counter to the public interest. The function cannot be denied *except by legislative fiat*; and there is none such here.

*Id.* at 126 (quoting *Handlon v. Town of Belleville*, 71 A.2d 624, 627–28 (N.J. 1950))

(emphasis added).

*Anchor Casualty* is different from this case in two ways. First, *Anchor Casualty* is procedurally different. There, we were addressing the power of an agency commissioner to reconsider her own decision; here, we are addressing the power of an agency commissioner to demand that an ALJ reconsider his decision. Second, as we have discussed above, section 14.62 places explicit restrictions on the actions that an agency may take once it receives an ALJ report with recommendation in a contested case where the proceedings before the ALJ have closed. As we recognized in *Anchor Casualty*, the agency is bound by such legislative directives. 91 N.W.2d at 126.

The decision in *Turnbladh* is also distinguishable from this case. That case arose out of a complaint that a prison warden improperly requisitioned food from the prison kitchen. 107 N.W.2d at 309. The Commissioner of Corrections met with the warden and the two reached an informal agreement that the food withdrawals were not illegal or dishonest but showed poor judgment and that discipline would be suspension with no pay for 15 days and repayment of the value of food withdrawals. *Id.* Less than a month later,

22

the Department of Corrections opened a formal proceeding on the same matter. *Id.* The warden, citing a provision of the Minnesota Administrative Procedure Act that allowed for informal disposition of any contested case by stipulation or agreed settlement, sought an injunction blocking the proceeding based on the prior informal agreement. *Id.* at 309–10.

We held that the case could proceed, reasoning that the "informal disposition" provision of the Act did not apply because the meeting was not a hearing under the Act. *Turnbladh*, 107 N.W.2d at 310–11. We further noted the power of a state agency to reopen, rehear, and redetermine the matter even after a determination has been made. *Id.* at 312.

*Turnbladh* is distinguishable from this case because, like *Anchor Casualty*, *Turnbladh* deals not with the power to force an ALJ or other independent referee to reconsider his decision (as in this case) but rather with the power of an agency to reconsider its own decision—in *Turnbladh*, an agency decision *made before the contested case process even started. Id.* at 309. More critically, in neither *Anchor Casualty* nor *Turnbladh* was the critical issue in this case at issue—the limitations on the time within which an agency must make a final decision accepting, modifying, or rejecting an ALJ report with recommendation.[16]

Finally, *Pfalzgraff* is also inapposite. *Pfalzgraff* was a case about unemployment benefits before the Department of Economic Security. 350 N.W.2d at 459. *Pfalzgraff* was

---

[16] For instance, pertinent to this case, the parallel question would be whether an agency could issue a decision modifying an ALJ report with recommendation 30 days after the contested case proceeding before the ALJ closed and then issue an amended decision 30 days later but within the 90-day limitation period for issuing a final order. That question is not before us.

not a case under the Act because the Department of Economic Security was not subject to the Act. Minn. Stat. § 14.03, subd. 2 (1982) ("The contested case procedures of the administrative procedure act provided in sections 14.57 to 14.70 *do not apply to* . . . (c) the unemployment insurance program in the department of economic security." (emphasis added)). More fundamentally, the statute in place that applied to the Department of Economic Security (which has since been repealed), expressly *allowed for* a remand.[17] *Pfalzgraff*, like *Anchor Casualty* and *Turnbladh*, has no bearing here.

\* \* \*

Accordingly, we hold that DHS does not have the implied authority to remand a contested case report with recommendation to the ALJ that issued it with instructions to reconsider the decision. Section 14.62, subdivision 2a, instead controls, which does not provide an option to "remand," but only for the agency to accept, modify, or reject the ALJ's report.

---

[17] Minn. Stat. § 268.10, subd. 5 (1982), stated in full:

> Within 30 days . . . any such party may appeal from such decision and obtain a review thereof by the commissioner or his duly authorized representative, and the commissioner within the same period of time may on his own motion order a review of any such decision. Upon review, the commissioner or his duly authorized representative may affirm, modify, or set aside any finding of fact or decision, or both, of the appeal tribunal on the basis of the evidence previously submitted in such case, *or remand such matter back to the appeal tribunal for the taking of additional evidence* and new findings and decision based on all of the evidence before it.

(Emphasis added.)

## CONCLUSION

For the foregoing reasons, we reverse the decision of the court of appeals.

Reversed.

PROCACCINI, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

DISSENT

CHUTICH, Justice (dissenting).

I respectfully dissent from the court's holding that Minnesota Statutes section 14.62 (2022) clearly and unambiguously does not allow an agency in a contested case proceeding to remand a report or order to the administrative law judge (ALJ) for further fact-finding or development of the record. I disagree because I conclude that the word "rejects" in section 14.62, subdivision 2a, has more than one reasonable interpretation, and the more appropriate interpretation is that a rejection of the ALJ's report encompasses a remand to the ALJ. I further conclude that the final order of the Commissioner of the Minnesota Department of Human Services (the Commissioner) was neither arbitrary nor capricious. Accordingly, I would affirm the decision of the court of appeals upholding the Commissioner's final order.

I agree with the recitation of facts in the court's opinion, but briefly highlight here the Commissioner's final order and the rationale supporting it. When the Commissioner issued her final order, she rejected the ALJ's conclusions of law and accepted, modified, and rejected, respectively, various parts of the ALJ's factual findings. The order concluded that the Minnesota Department of Human Services proved by a preponderance of the evidence that Trinity committed abuse.

The Commissioner explained that, unlike the ALJ, she gave probative value to the spreadsheets that the Minnesota Department of Human Services submitted as evidence. Notably, she stressed the seriousness of Trinity's violations, explaining that some of the violations were simply to "extract more money" from the Minnesota Health Care Plan.

D-1

These violations included "billing for overlapping services, billing for more units than what was provided, billing when no services were provided, and billing for [Registered Nurse] services when [Licensed Practicing Nurse] services were provided."

The Commissioner further found that Trinity's actions harmed its clients because it took actual services away from the recipients. For example, the Commissioner found that appellant Etyane Ayana, Trinity's owner, personally billed for personal care assistance services that were never provided to at least one client. The Commissioner explained that patients "are allotted a number of service hours based on their disability," and by billing the patient but not providing the services needed, the patients ran low on the number of service hours available to them. Accordingly, the patient received no personal care assistance services and was "left alone" to care for herself. The Commissioner found that Trinity's harmful behavior was abuse and warranted termination from the Minnesota Health Care Programs, and that the Minnesota Department of Human Services was entitled to reimbursements of over $1.2 million for nursing, personal care assistant, and homemaking services.

A.

1.

For the reasons set forth below, I conclude that the Commissioner had the authority to remand the case to the ALJ under section 14.62. First, I believe that the initial sentence of section 14.62, subdivision 2a, is ambiguous, that is, susceptible to more than one reasonable meaning. *See State v. Pakhnyuk*, 926 N.W.2d 914, 920 (Minn. 2019). That sentence states: "Unless otherwise provided by law, the report or order of the

administrative law judge constitutes the final decision in the case unless *the agency modifies or rejects it* under subdivision 1 within 90 days after the record of the proceeding closes under section 14.61." Minn. Stat. § 14.62, subd. 2a (emphasis added). The statutory language expressly allows the agency to "modif[y] or reject[]" an ALJ's recommendation; the question before us is whether the agency may *remand* a case to the ALJ. *Id.*

I agree with the court that one reasonable reading of this opening sentence would allow the Commissioner only three options—to accept, to modify, or to reject the ALJ's report. But I believe that another reasonable interpretation exists because, in this context, "rejects" inherently includes a remand. The Commissioner's remand here was part and parcel of her *rejection* of the ALJ's order and decision.

To be sure, the Commissioner's order of remand does not explicitly say that she was rejecting the ALJ's first report, but the remand order implicitly rejected it. She made it clear that she was remanding the matter for further factual findings. The Commissioner stated that because the ALJ did not consider the summary spreadsheets and evidence that the Minnesota Department of Human Services relied upon to make the summary spreadsheets, the ALJ failed to make the appropriate factual findings about the reliability, accuracy, and weight of the evidence. The Department of Human Service's order to remand stated:

> Because it is the role of the [ALJ] to make the appropriate findings and because it is not clear that the [ALJ] applied the correct standard under Minnesota Rules of Evidence 1006, the Commissioner remands to the [ALJ] to amend the findings and conclusions in accordance with the applicable rules of law.

This interpretation of "rejects" that encompasses a remand is supported by dictionary definitions that define the ordinary meaning of the term.[1]  *See* Minn. Stat. § 645.08(1) (2022) ("[W]ords and phrases are construed according to rules of grammar and according to their common and approved usage."); *Pakhnyuk*, 926 N.W.2d at 920.  Here, "reject" has several meanings and, in this context, generally means to "refuse to accept" or "to declare not to be true."  *See, e.g.*, *Webster's New Explorer Thesaurus* 503 (2005) ("[T]o be unwilling to grant; to declare not to be true; to get rid of as useless or unwanted; to show unwillingness to accept, do, engage in, or agree to"); *The American Heritage Dictionary of the English Language* 1482 (5th ed. 2018) ("To refuse to accept, submit to, believe, or make use of; [t]o refuse to consider or grant; deny."); *Webster's Third New International Dictionary* 1915 (1976) ("To refuse to acknowledge, adopt, believe, acquiesce in, receive, or submit to: decline to accept").

In addition, the definition of "remand"—"[t]o send (a case or claim) back to the court or tribunal from which it came for some further action"—fits well with the ordinary meaning of reject; a case is only remanded under circumstances when a different reviewing decisionmaker rejects some or all of the basis for the underlying decision.  *Remand*, *Black's Law Dictionary* (11th ed. 2019).

These definitions show that the Commissioner rejected the ALJ's findings when she refused to adopt them and then remanded the matter.  By refusing to accept the ALJ's

---

[1]	Chapter 14 does not define the term "rejects," so dictionary definitions may be helpful to determine the term's ordinary meaning.  *See* Minn. Stat. § 645.08(1) (2022).

recommendation, the Commissioner's actions fell within the definition of "rejects" under section 14.62.

The court dismisses the interpretation that a rejection under section 14.62 can also include a remand by disregarding dictionary definitions. It notes simply that the dictionary definitions are not helpful in this context. But by doing so, the court needlessly gives the word "rejects" an overly technical and "cramped reading," and deprives agencies of an important tool in contested case proceedings. *See Peoples Nat. Gas Co. v. Minn. Pub. Utils. Comm'n*, 369 N.W.2d 530, 534 (Minn. 1985). As the amici agencies correctly contend, the word rejects is broad and inherently contemplates a remand.

Moreover, the broader context of this case supports the reasonableness of this interpretation. The Commissioner determined that because the ALJ misapplied the Minnesota Rules of Evidence, he did not make the necessary factual findings about the reliability, accuracy, and weight of the evidence. The Commissioner rejected the ALJ's report on that basis. Notably, the experienced ALJ understood that this remand "did reject" his report. As the ALJ explained, if the Commissioner "rejects parts of [an ALJ's] report, she could simply leave those findings, conclusions, or recommendations behind, *or* she could remand the matter to the [ALJ] for further proceedings." (Emphasis added.) The Commissioner chose to reject part of the ALJ's report and remanded the matter for further proceedings here. Accordingly, section 14.62 and the meaning of "rejects" are each subject to two reasonable interpretations, and the term is therefore ambiguous.

2.

Because the term "rejects" in section 14.62 is subject to two reasonable interpretations, tools of statutory construction are helpful to determine the Legislature's intent. *See* Minn. Stat. § 645.16 (2022). Applying these considerations—"the object to be attained," "the consequences of a particular interpretation," and the "administrative interpretations of the statute"—I conclude that the better interpretation of "rejects" in section 14.62 includes a remand. *See id.* The court's sweeping conclusion—that a commissioner may never remand a case to an ALJ—is simply too broad and neglects the nuanced realities that agencies face in contested case proceedings.

First the "object to be obtained" by the statute supports interpreting "rejects" to permit a remand from the Commissioner to the ALJ. The court acknowledges that a remand from the Commissioner to the ALJ allows the record to reopen to enable parties to bring in new facts—a process that would save resources and improve efficiency—if a need for a better record or more fact-finding exists. Ensuring that an adequate record in the contested case proceeding exists at the administrative level is far more efficient than requiring an appeal and waiting for an appellate court to order a remand.

Moreover, a remand to the ALJ might make an appeal unnecessary. Allowing the Commissioner to remand a case in the first instance furthers the stated purpose of the Minnesota Administrative Procedure Act: to "simplify the process of judicial review of agency action as well as increase its ease and availability" and "to strike a fair balance between [the stated] purposes and the need for efficient, economical, and effective government administration." Minn. Stat. § 14.001 (2022).

Here, the Commissioner remanded the case to the ALJ after concluding that the ALJ made no findings of fact about the summary evidence because he may not have applied the correct legal standard under the Minnesota Rules of Evidence. And the role of the ALJ is to make factual findings. Minn. Stat. § 14.50 (2022). As the Commissioner argues, it is more "efficient to allow the ALJ to first review the evidence under the correct standard." The court's decision to *never* allow a commissioner to remand a case to the ALJ does not provide agencies with the flexibility needed to make fully informed decisions, especially when these decisions affect Minnesotans in their everyday lives.

For example, the ability to remand is equally crucial when a person procedurally defaults before an ALJ but then appears in the case soon after the ALJ has lost jurisdiction. In contested case hearings, a person may default by failing to appear or to respond when the issue is before the ALJ at the Minnesota Office of Administrative Hearings. *See* Minn. R. 1400.6000 (2021) (noting that a default occurs when a party fails to appear at a prehearing conference, settlement conference, or hearing). And as amicus Southern Minnesota Regional Legal Services explains, the contested case process can be difficult for self-represented persons to manage, which leads to the possibility of procedural defaults, even in meritorious cases. But once the ALJ issues the report, the ALJ loses jurisdiction of the case. Without the power to remand a case to the ALJ, the agency is left with little recourse. For instance, if the agency adopts the ALJ's recommendation, the defaulting party must either appeal to the court of appeals or accept the outcome. *See* Minn. Stat. § 14.63 (2022). And if the agency tries to decide the case on the merits, it must

do so without having a fully developed hearing record. Neither option leads to a just outcome for the self-represented person nor an efficient process for the agencies.

The court and appellants, however, note that allowing a remand could inappropriately broaden the Commissioner's power under section 14.62. But the Legislature already has given the Commissioner the power under section 14.62 to *reject or modify any* of the ALJ's findings and recommendations, as long as the agency includes the reasons for doing so. Minn. Stat. § 14.62, subd. 1. Permitting a remand to better develop the factual record does not broaden the Commissioner's powers; rather, it gives the parties the ability to ensure that the record is established *before* it goes to the agency for the final decision.

Moreover, no evidence suggests that the Commissioner could somehow abuse this power by indefinitely remanding a case until getting the desired result from the agency. Instead, the contested case hearing process takes agencies' resources (time and cost); ultimately, as amici commissioners point out, there is not an incentive for agencies to needlessly prolong cases. Moreover, an agency must provide a written reason when it rejects the ALJ's findings. Minn. Stat. § 14.62, subd. 1. And most importantly, the Commissioner cannot act arbitrarily or capriciously. Minn. Stat. § 14.69 (2022). Accordingly, appellants' concerns regarding endless remands are unfounded. These policy arguments favor permitting a remand from the Commissioner to the ALJ.

Second, the Minnesota Office of Administrative Hearings' rules provide further guidance that a remand is permitted. Minn. Stat. § 645.16(8) (permitting reference to "administrative interpretations" of an ambiguous statute). These rules "have the force and

effect of law," and they make an express reference to a remand. Minn. Stat. § 14.38 (2022). Rule 1400.7600 addresses the certification of legal questions from an administrative law judge to an agency and states: "In deciding what motions should be certified, the judge shall consider the following: . . . *whether it is necessary to promote the development of the full record and avoid remanding*." Minn. R. 1400.7600 (2021) (emphasis added). In other words, Rule 1400.7600 states that the agency could "avoid remanding," signifying that the agency *could* remand a case to the ALJ (particularly to allow for "the development of the full record," which happened here).

Finally, the consequences provide additional support for interpreting section 14.62 to encompass a remand from the Commissioner to the ALJ. *See* Minn. Stat. § 645.16(6). As amici agencies point out, agencies have remanded cases, even after the Legislature amended section 14.62, subdivision 2a, to include "modifies or rejects." *See, e.g.*, *In re Application for a Route Permit for the Noble Flat Hill Windpark I*, No. 15-2500-20657-2PUC, 2010 WL 6748986, at *1 (Minn. Off. Admin. Hearings Sept. 7, 2010) (remanding a case from the Minnesota Public Utilities Commission to the Minnesota Office of Administrative Hearings to reopen and supplement the record); *In re SIRS Appeal of Grove Homes, Inc.*, No. 15-1800-15307-1, 2006 WL 1412824, at *2 (Minn. Off. Admin. Hearings May 1, 2006) (explaining that the commissioner of the Minnesota Department of Human Services adopted the ALJ's findings, conclusions, recommendation, but remanded the recovery portion of the case to the agency); *Lewis v. City of Minneapolis*, No. 69-3100-4213-2, 1990 WL 710328, at *1 (Minn. Off. Admin.

Hearings Dec. 1990) (noting that the Commissioner of the Minnesota Department of Veterans Affairs remanded a case to the ALJ to determine damages).

These cases show that, in certain situations, a remand is appropriate and necessary. The court's conclusion that remands are *never* appropriate disrupts agency custom, and the consequences could undermine the administrative law framework applicable to almost every agency in the state. Accordingly, I conclude that the word "rejects" under section 14.62 is subject to two reasonable interpretations, and the better interpretation includes permitting a "remand" from the Commissioner to the ALJ.

## B.

Because I would find that the Commissioner had authority to remand the first report to the ALJ, I would also reach the second issue of whether the Commissioner's final decision following the remand was arbitrary and capricious. The appellants argue that the Commissioner's final order was arbitrary or capricious because the Commissioner's actions, namely relying on the summary spreadsheets, showed that she was expressing her will rather than her judgment. I agree with the court of appeals that the Commissioner did not act arbitrarily or capriciously. *See In re SIRS Appeals by Trinity Home Health Care Servs. & Etyane Ayana*, No. A22-0183, 2022 WL 6272045, at *9–10 (Minn. App. Oct. 10, 2022).

On review, a court "may reverse or modify the decision [of the Commissioner] if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are: . . . arbitrary or capricious." Minn. Stat. § 14.69; *see In re Excess Surplus Status of Blue Cross & Blue*

*Shield of Minn.*, 624 N.W.2d 264, 277 (Minn. 2001). An agency ruling is arbitrary and capricious if the agency:

> (a) relied on factors not intended by the legislature; (b) entirely failed to consider an important aspect of the problem; (c) offered an explanation that runs counter to the evidence; or (d) the decision is so implausible that it could not be explained as a difference in view or the result of the agency's expertise.

*Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs*, 713 N.W.2d 817, 832 (Minn. 2006). Notably, "[t]he standard of review is not heightened where the final decision of the agency decision-maker differs from the recommendation of the ALJ"; however, a "[r]ejection of the ALJ's recommendations *without explanation* . . . may suggest that the agency exercised its will rather than its judgment and was therefore arbitrary and capricious." *In re Excess Surplus*, 624 N.W.2d at 278 (emphasis added).

Here, the Commissioner's thorough and accurate order explained each of her departures from the ALJ's final recommendation, and the record supports her findings. As the court of appeals aptly explains, the "20-page, single-spaced final decision thoroughly explains the commissioner's decision-making and reflects that the final decision rejects the ALJ's findings and conclusions for the rational reason that the commissioner gave probative value to the spreadsheets and the ALJ did not." *Trinity*, 2022 WL 6272045, at *9.

I also believe that the Commissioner's directions to the ALJ in the remand order did not tell the ALJ what he needed to find in the evidence; rather, it directed the ALJ to make factual findings based on the spreadsheet. Because I conclude that the Commissioner reasonably found that the summary spreadsheets were probative, and that she explained

D-11

*why* she rejected the ALJ's recommendation, the Commissioner's decision was neither arbitrary nor capricious.[2]

For the reasons given above, I respectfully dissent.

---

[2]     I do not address Trinity's assertion that the Commissioner's final order was not supported by substantial evidence because Trinity failed to raise the issue in its petition for review. Generally, we do "not address issues that were not raised in a petition for review." *State v. Myhre*, 875 N.W.2d 799, 806 (Minn. 2016) (quoting *In re GlaxoSmithKline PLC*, 699 N.W.2d 749, 757 (Minn. 2005)); *see also In re Estate of Figliuzzi*, 979 N.W.2d 225, 231 n.4 (Minn. 2022).